## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **CHRISTOPHER JONES** | * | **CIVIL ACTION NO.** |
| | * | |
| *Plaintiff* | * | **SECTION** |
| | * | |
| **VERSUS** | * | **JUDGE** |
| | * | |
| **JASON WILLIAMS in his official** | * | **MAGISTRATE** |
| **Capacity, and ABC INSURANCE** | | |
| **COMPANIES, 1- 10** | * | **JURY TRIAL DEMAND** |
| | * | |
| | * | |
| *Defendants* | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT

1.      Christopher Jones ("Jones" or "Mr. Jones") was wrongfully convicted and served over twenty-two (22) years in prison for a crime he did not commit as a result of repeated violations of his constitutional rights by the Orleans Parish District Attorney's Office ("OPDA"). Specifically, OPDA suppressed exculpatory and/or favorable information and falsely mislead the jury, all in violation of OPDA's obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny.

2.      Jones[1] was arrested on August 11, 1999, and charged in October 1999 with seven (7) counts of armed robbery in connection with a string of three (3) robbery incidents that all took place on August 10, 1999. OPDA aggressively prosecuted Jones for the robberies, all while suppressing information provided by one of the robbery victims that would have enabled the defense to call the viability of the prosecution's timeline into question, thus rendering the State's theory impossible.

---

[1] Along with co-defendant, Leonard Henderson, who is not a party to this Complaint.

3.      Specifically, the State's theory of the case centered on the alleged ability of the perpetrators to accomplish all three robberies in a matter of minutes. The State withheld a critical piece of exculpatory evidence from one of the robbery victims stating that he had seen Jones "for like ten minutes" before the final incident, thus rendering Jones's presence at the other two incidents impossible. This evidence undercut the State's principal theory that Jones committed all the charged offenses, which based upon this illegally withheld evidence was demonstrably impossible.

4.      The State also knowingly left the jury with a false impression about Jones's criminal record, which was used to undermine the credibility of his testimony. Specifically, the State misrepresented Jones' prior non-adjudication as a minor as a prior conviction and used the purported prior conviction as the basis for its impeachment of Jones during cross-examination, which the State later admitted was done knowingly by the prosecutor.

5.      Having been denied access to this critical exculpatory evidence, Jones was tried on six (6) counts and found guilty on four (4) of the six. The court's May 19, 2000 sentencing hearing resulted in a two hundred and twenty-eight (228) year sentence for Jones.

6.      The State's failure to disclose this exculpatory evidence was material to Jones' defense and would have rendered the State's overall theory of the case impossible. Had the OPDA fulfilled their constitutional and ethical obligations, Jones would not have been wrongfully convicted and **<u>unlawfully held for over twenty-two (22) years</u>**.

7.      Jones sought relief in both state and federal court. In 2008, he filed a federal petition for habeas corpus in the Eastern District of Louisiana. After conducting an *in camera* review of portions of the OPDA file, the federal district judge, Judge Jay Zainey, ordered the State to disclose portions of its file that contained exculpatory evidence.

8.      A portion of the State's file evidenced several handwritten notes of prosecutors who interviewed the victims of the incidents. One of these notes reflected that one of the victims said he had "noticed the [defendants] before for like ten minutes."

9.      This evidence should have been disclosed because it called into question the State's entire theory that the same perpetrators could have committed all three incidents.

10.     Further review of the State's file evidence that it falsely misled the jury with regard to Jones's purported criminal record, which was used by the prosecutor to undermine his testimony at trial.

11.     As a result of this evidentiary discovery, OPDA's Civil Rights Division proposed a plea agreement as an "imperfect but necessary and appropriate resolution" to address the prosecutorial misconduct that led to Jones' conviction(s).

12.     The Proposed Joint Post-Conviction Plea Agreement acknowledged OPDA's violation of Jones's constitutional rights.

13.     The Proposed Joint Post-Conviction Plea Agreement acknowledged that there was "no dispute that the State never disclosed before trial the exculpatory statement made by a key victim-eyewitness."

14.     The Proposed Joint Post-Conviction Plea Agreement acknowledged that there was no "dispute that the prosecution had evidence that Christopher Jones was not convicted of a crime in Mississippi and nonetheless left a false impression with the jury by undermining his credibility."

15.     After being incarcerated for over twenty-two (22) years for crimes he did not commit, Jones was released on December 9, 2021.

16.     The prosecutorial misconduct that led to a violation of Jones's constitutional rights was not an isolated event. Rather, OPDA has maintained and carried out an unconstitutional policy,

custom, and practice of violating the constitutional rights of defendants by failing to disclose evidence favorable to the defendant.

17.     OPDA's failure to disclose favorable information to defendants has been recognized by courts as a "storied, shameful history of the local prosecuting authorities' noncompliance" with its duty to disclose evidence favorable to defendants.

18.     OPDA's failure is documented in dozens of court decisions, including the United States Supreme Court decisions of *Kyles v. Whitley*, 514 U.S. 419 (1995), *Connick v. Thompson*, 563 U.S. 51 (2011), and *Smith v. Cain*, 565 U.S. 73 (2012).

19.     OPDA's failure is acknowledged in statements from various OPDA representatives, as well.

20.     By and through the various court decisions, the OPDA knew, or should have known, that its suppression of evidence favorable to defendants violated its disclosure obligations pursuant to *Brady* and its progeny.

21.     As a direct and proximate result of Defendants' conduct, Jones has suffered injuries and damages including, but not limited to, pain and suffering, severe mental anguish, emotional distress, lost income, humiliation, injury to reputation, psychological damage, and restriction of all forms of personal freedom; many of which continue long after Jones was released.

22.     Jones now brings this action against OPDA to recover damages for the injuries he suffered and losses he sustained because of OPDA's policy or custom of violating the constitutional rights of defendants by failing to disclose evidence favorable to defendants, and to hold OPDA accountable for depriving him of over two decades of his life, liberty, and freedom.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over Jones's 42 U.S.C. §1983 claim pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343.

24.     This Court has subject matter jurisdiction over Jones's state law claim pursuant to 28 U.S.C. §1367.

25.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b).

## PARTIES

26.     Plaintiff, Christopher Jones ("Jones" or "Mr. Jones") is a 44 year old male who currently resides in Houston, Texas.

27.     Defendant, Jason Williams ("District Attorney," or "DA Williams", or "Williams"), whom Jones sues in his official capacity only, is the Orleans Parish District Attorney and head of the Orleans Parish District Attorney's Office ("ODPA"), a local government agency located in the Parish of Orleans, Louisiana.

28.     Defendants ABC Insurance Companies 1-10 are as-yet unknown insurance companies who may have issued, and currently have in effect one or more policies of insurance covering Defendant DA Williams and/or the OPDA and/or the actions complained of herein.

## FACTUAL BACKGROUND

### I.      The Robbery Incidents

29.     The three incidents that led to Jones' wrongful conviction(s) took place on the night of August 11, 1999.

30.     The incidents allegedly took place at 10:10pm, 10:15pm, and 10:17pm, respectively.

31.     Importantly, three witnesses testified that Jones, who lived in Mississippi at the time, was still in Jackson, Mississippi until 10:30pm on August 11, 1999.

32.     The First Robbery took place at 10:10pm at the C.C.'s Coffee in the 2800 block of Esplanade Avenue in New Orleans, Louisiana. Two victims, Reverend Daniel Dukes and Richard Crusta, were robbed by a man with a gun.

33.     According to the description given to police at the scene the perpetrator was a black male, dark skin, about 6'3" tall, wearing all dark clothes, and holding what was thought to be a .45 caliber Glock.

34.     An officer, Chris Kaulka, later testified that one of the victims told him the robber fled on foot northbound on Esplanade.

35.     The second robbery took place at 10:15 p.m. in the 2600 block of D'Abadie Street, near the intersection of North Broad Street in New Orleans, Louisiana.

36.     Two victims, Michael Brooks and Ronald Jackson, were allegedly approached by two men on foot who robbed them of coin change and a wallet.

37.     The victims told police that the perpetrators were two black males in their early twenties, one wearing a white t-shirt and dark blue jeans and armed with a blue steel automatic handgun, the other wearing a blue shirt with a design on it and stone washed jean shorts and armed with a blue steel revolver.

38.     The third robbery took place at 10:17 p.m. outside of a bar in the 2800 block of Canal Street in New Orleans, Louisiana.

39.     Two victims, Kevin Thomas and Jamal Jerreau, were standing in front of the Bus Stop Lounge when there were robbed by two armed men.

40.     The police report indicated that one perpetrator was described as wearing a gold t-shirt with writing on it, long denim blue jeans, white tennis shoes, and having multiple gold teeth, possibly

four. The other perpetrator was described as wearing a red t-shirt, long denim blue jeans, and white tennis shoes.

41.     One of the two perpetrators fired his weapon when the victims were around twenty-five (25) feet away. Police found a .45 caliber casing at the scene.

42.     Later that evening, at approximately 3:00 a.m., one of the victims from the third incident reported to nearby police that he saw the men that had robbed him. Police arrested Jones and two other men.

43.     After arresting the three men, police recovered a .45 caliber Glock on Jones, a parking claim receipt for Mr. B's parking garage, and cash.

44.     Following the arrest(s), the police orchestrated a photographic lineup. One of the victims of the second incident, Michael Brooks, identified Jones in the lineup as the perpetrator. The other victim from the second incident, Ronald Jackson, was unable to identify Jones as the perpetrator.

45.     One of the victims of the third incident, Kevin Thomas, identified Jones as the perpetrator, but later testified at trial that the photograph the police used of Jones was disproportionately large compared to the others. The other victim from the third incident, Jamal Jerreau, identified only one of the alleged co-perpetrators and not Jones.

**II.    The Trial**

46.      On October 7, 1999, the State charged Jones by bill of information with seven (7) counts of armed robbery in connection with the three incidents. Jones entered a plea of not guilty.

47.     A jury trial took place on May 11, 2000. Jones (and another defendant) were tried on six of the seven counts.

48.    The defense called several witnesses, all of whom testified that they had seen or heard from Jones in a timeframe that would have made his presence in New Orleans at the time of the incidents impossible.

49.    Nonetheless, and despite the factual logistics involved, the State's theory turned on the ability of the perpetrators to perform all three robberies in a matter of seven (7) minutes.

50.    The State conducted an interview of Jamal Jerreau, one of the victims from the third incident, who told the state that he had "noticed the [defendants] before for like ten minutes."

51.    The State did not produce or disclose this exculpatory information to defense counsel prior to, during, or after trial.

52.    This information specifically undermined the State's primary theory that the same perpetrators committed all of the charged offenses.

53.    OPDA has/had a constitutional obligation to disclose evidence favorable to the defense.

54.    This obligation includes the requirement to provide exculpatory evidence material to the defendant's guilt or innocence.

55.    The State's failure to disclose this information was in violation of Jones' constitutional rights.

56.    The State also left the jury with a false impression of Jones' criminal record, and that impression was used to undermine Jones' credibility at trial.

57.    The State questioned Jones extensively about whether he had "been convicted of any crimes?"

58.    Jones, having never been convicted of a crime, testified that he had not.

59.     The State derided Jones' testimony and suggested to the jury, using a court document, that Jones was lying. In reality, the document substantiated Jones' testimony and clearly evidenced that he had never been convicted of a crime.

60.     Internal notes from OPDA's file clearly acknowledged that Jones was not previously convicted of a crime, and the OPDA had knowledge that he had not been convicted of a prior crime.

61.     A post-trial memorandum authored by one of the trial Assistant District Attorneys, which sought authorization to dismiss counts, specifically states that "[i]t should be noted that neither defendant has any convictions."

62.     Yet, the crux of the State's cross-examination of Jones was impeachment based on a purported prior conviction.

63.     It was/is improper for the OPDA to knowingly leave the jury with a false impression.

64.     The State later acknowledged that its failures to disclose during Jones' trial were significant.

65.     The jury found Jones guilty relative to the second and third incidents.

**III.     The Sentencing**

66.     Jones was sentenced on May 19, 2000. On each counts one and two, the court sentenced Jones to serve thirty (30) years at hard labor, to run concurrently with each count, and consecutively with any other sentence imposed, with credit for time served, and without the benefit of probation, parole, or suspension of sentence.

67.     On counts five and six, the court sentenced Jones to serve ninety-nine (99) years at hard labor, to run consecutively with each count and consecutively with any other sentence imposed, with credit for time served, and without the benefit of probation, parole, or suspension of sentence.

68.    The net result was a two hundred and twenty-eight (228) year sentence.

69.    Jones began his wrongful incarceration on May 14, 2001.

### IV.    Discovery of OPDA's Failures to Disclose

70.    Following Jones' wrongful conviction and sentence, OPDA continued to withhold evidence that was favorable to him and material to his innocence.

71.    Jones appealed his convictions, but was eventually denied a rehearing, a writ, and reconsideration.

72.    In 2008, Jones filed a Habeas Corpus petition in Federal Court. After conducting an *in camera* review of portions of the OPDA file, the federal district judge, Judge Zainey, ordered the State to disclose portions of its file.

73.    That file evidenced several handwritten notes of prosecutors who interviewed the victims of the incidents. Once of these notes reflected that one of the victims said that he had "noticed the [defendants] before for like ten minutes."

74.    Further review of the State's file evidences that it falsely misled the jury about Jones' purported criminal record, which was used by the prosecutor to undermine his testimony at trial.

### V.    The Proposed Joint Post-Conviction Plea Agreement

75.    As a result of this evidentiary discovery, OPDA's Civil Rights Division proposed a plea agreement as an "imperfect but necessary and appropriate resolution" to address the prosecutorial misconduct that led to Jones' conviction(s).

76.    The Proposed Joint Post-Conviction Plea Agreement acknowledged OPDA's violation of Jones' constitutional rights.

77.     The Proposed Joint Post-Conviction Plea Agreement acknowledged that there was "no dispute that the State never disclosed before trial the exculpatory statement made by a key victim-eyewitness."

78.     The Proposed Joint Post-Conviction Plea Agreement acknowledged that there was no "dispute that the prosecution had evidence that Christopher Jones was not convicted of a crime in Mississippi and nonetheless left a false impression with the jury by undermining his credibility."

79.     The Proposed Joint Post-Conviction Plea Agreement vacated the convictions of Jones obtained in the case of #410-069 "G."

80.     The Proposed Joint Post-Conviction Plea Agreement also stipulated that Jones plead guilty to one count of armed robbery.

### VI.     OPDA's Longstanding Policy and Custom of Violating the Constitutional Rights of Defendants by Not Disclosing Material, Information, and Evidence Favorable to Defendants

81.     Paragraphs 1-80 are repeated and re-alleged as if fully set forth herein.

82.     OPDA, acting under color of law, withheld from Jones favorable evidence relating to the robbery incidents that was material to Jones' guilt or innocence, and/or falsely mislead the jury in violation of Jones' rights under the United States Constitution to the disclosure of such information.

83.     OPDA's violations of Jones' constitutional right to the disclosure of favorable evidence was not an isolated event. Rather, it was part of a longstanding pattern of similar violations of OPDA that are well-documented.

84.     OPDA has maintained and carried out an unconstitutional policy, custom, and practice of violating the constitutional rights of defendants charged with crimes by failing to disclose to them information that is favorable to defendants.

85.     In *Kyles v. Whitley*, the U.S. Supreme Court overturned a capital conviction due to "so many instances of [OPDA's] failure to disclose exculpatory evidence," and criticized OPDA for "blatant and repeated violations" of *Brady* and warned of a "system of prosecution" that could "descend to a gladiatorial level unmitigated by any prosecutorial obligation for the sake of the truth."

86.     Despite the Supreme Court's condemnation, District Attorney Harry Connick, Sr., who was in office during Jones' arrest and conviction, "saw no need, occasioned by *Kyles*, to make any changes" to OPDA's policies or customs as to the disclosure of *Brady* material.

87.     In 2017, the Louisiana Court of Appeal, Fourth Circuit noted "the storied, shameful history of the local prosecuting authorities' noncompliance" with its duty to disclose to defendants' information that is favorable to them. *See State v. Wells*, 191 So.3d 1127 (La. App. 4 Cir. 4/13/16).

88.     OPDA's Civil Rights Division has acknowledged that, during a period *prior to Jones' prosecution*¸ OPDA "did not disclose handwritten notes taken by prosecutors during witness interview" as "a matter of practice."

89.     A report examined thirty-six (36) cases in which OPDA secured a death sentence during the reign of District Attorney Harry Connick, Sr. (between 1973 and 2002) and determined that evidence favorable to the defense was withheld by OPDA in twenty-five (25%) percent of cases.

90.     The report also examined an additional twenty-five (25) non-capital cases "in which allegations of suppression were made" and found that OPDA withheld evidence favorable to the defense in nineteen (19) of the twenty-five (25) cases. In the remaining cases, the court determined that the allegations warranted an evidentiary hearing. Fourteen (14) of those nineteen (19) cases resulted in exonerations and/or conviction reversals.

91.     Under the administration of District Attorney Harry Connick, Sr., who held office at the time of Jones' arrest and conviction, the OPDA "had a policy of keeping away as much information as possible from the defense attorney," as described by successor District Attorney Eddie Jordan.

92.     Elected to succeed his predecessor District Attorney Cannizzaro in 2020, District Attorney Jason Williams' administration vowed to introduce a policy of "open file discovery and information sharing" that was "starkly different than that of the previous administrations."

93.     DA Williams intended to develop "written policies that articulate and explain at a granular level, which is expected from an [assistant district attorney] . . . in terms of their ongoing obligation" to provide favorable information to defendants.

94.     Upon taking office, DA Williams noted a "lack of order and lack of systems [that] really speaks to how this place has operated for a very long time." "It speaks to how the wrong person gets arrested and gets prosecuted and convicted."

95.     As a result of OPDA's unconstitutional policies or customs, OPDA has engaged in the wrongful prosecution of innocent persons.

**VII.    OPDA's Unconstitutional Written Policy**

96.     In 1987, DA Connick, the then-head of OPDA and its official policymaker, officially adopted or promulgated a "Policy manual" outlining the duties and responsibilities of those who work at OPDA.

97.     At all times relevant, DA Connick was acting as an independent local official policymaker in establishing OPDA's internal policies and training regarding prosecutors' acquisition of, security of, and disclosure of *Brady* materials.

98.     The manual, which upon information and belief, remained in force during the period of Jones' arrest and conviction, include a policy regarding the disclosure of favorable information to

defendants that provided, in part: "In most cases, in response to the request of defense attorneys, the Judge orders the State to produce so-called *Brady* material – that is, information in the possession of the State which is exculpatory regarding the defendant."

99.     DA Connick testified that *Brady* only required production of evidence "that exculpates the accused," as opposed to evidence merely "favorable" to the defense.

100.    The written policy of OPDA was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA, in that it:

   a.   Suggested that OPDA prosecutors were obligated to disclose favorable information to a defendant only if requested to do so by the defendant's attorney when, in truth and fact, that obligation existed regardless of a request by a defendant's attorney;

   b.   Suggested that OPDA prosecutors were obligated to disclose favorable information to a defendant only if a judge ordered them to do so when, in truth and fact, that obligation existed regardless of a judge-ordered disclosure;

   c.   Required OPDA prosecutors to disclose only "exculpatory" information when, in truth and fact, OPDA was required to disclose information that could be used to impeach the trial testimony of an OPDA witness or was otherwise favorable to the defendant;

   d.   Did not require OPDA prosecutors to disclose information that was not initially in OPDA's possession, but was only in the possession of the NOPD, when, in truth and fact, OPDA was required to disclose such information;

   e.   Suggested that OPDA's obligation to disclose favorable information to a defendant charged with a crime applied only in most, but not all, cases;

   f.   Did not expressly require OPDA prosecutors to disclose information that was favorable to the defendant even if that information was not documented.

101.    The known and/or obvious consequence of this written policy is the violation of the constitutional rights of the defendants OPDA prosecuted.

102.    DA Connick has admitted that OPDA's written policy is "not comprehensive" and "doesn't say anything about favorable" information. Similarly, DA Cannizzaro has testified that the written policy is inconsistent with the constitutional obligations of prosecutors to disclose favorable information to a criminal defendant.

### VIII.   OPDA's Unconstitutional Unwritten Policy or Custom

103.    OPDA has maintained and carried out, for years, an unwritten policy or custom of not disclosing favorable information to defendants it prosecuted.

104.    The known and/or obvious consequence of this unwritten policy or custom is the violation of the constitutional rights of the defendants OPDA prosecuted.

105.    The existence of OPDA's unwritten policy or custom is supported by publicly available information in which a court has determined, or OPDA has acknowledged, that OPDA failed to disclose favorable information to a defendant charged with a crime.

106.    Based solely on publicly available information, OPDA has failed to make such constitutionally required disclosures in no less than 46 cases, at least 35 of which occurred before Jones' trial.

107.    Of these forty-six (46) cases, at least nine (9) resulted in reversals of convictions by the United States Supreme Court, the United States Court of Appeals for the Fifth Circuit, or the Louisiana Supreme Court, the state's highest court, on the basis of *Brady* violations prior to Jones' trial. *See Kyles v. Whitely*, 514 U.S. 419 (1995); *Monroe v. Balckburn*, 607, F.2d 148 (5th Cir. 1979); *Davis v. Heyd*, 479 F.2d 446 (5th Cir. 1973); *State v. Knapper*, 579 So.2d 956 (La. 1991); *State v. Rosiere*, 488 So.2d 965 (La. 1986); *State v. Perkins*, 423 So.2d 1103 (La. 1982); *State v.*

*Curtis*, 384 So.2d 396 (La. 1980); *State v. Falkins*, 356 So.2d 415 (La. 1978); *State v. Carney*, 334 So.2d 415 (La. 1976).

108.    These instances, although well-documented, significantly understate the actual number of times OPDA has violated the constitutional rights of defendants with regard to its failure to disclose evidence favorable to defendants. As recognized by United States Supreme Court Justice Ruth Bader Ginsberg, *Brady* violations "are not easily detected" and are frequently the result of chance discovery. The violation of a defendant's right to the disclosure of evidence favorable to him is inherently difficult to detect because it inherently involves the suppression of information.

109.    Similarly, DA Connick has testified that, in certain cases, there have been documented *Brady* violations by OPDA, but no publicly reported court decision. There have also been cases in which the courts granted relief on other grounds. In such cases, it is difficult, if not impossible, to accurately identify the overwhelming number of cases in which OPDA failed to disclose evidence favorable to defendants.

110.    There were additional cases decided prior to Jones' trial in which the Louisiana Supreme Court ruled that a prosecutor from another DA's office failed to disclose evidence favorable to a defendant, which is further evidence that OPDA was well-aware of its constitutional obligation to disclose evidence favorable to a defendant.

111.    OPDA's long-standing policy or custom of disregarding its *Brady* obligations is further evidenced by sworn testimony and admissions from former OPDA prosecutors, DA Connick, and heads of OPDA who succeeded DA Connick.

112.    DA Connick, who was DA at the time of Jones' arrest and conviction, has testified that he was unaware that OPDA was required to disclose all information favorable to the defendant in accordance with *Brady*.

113.    DA Connick has also testified that a prosecutor's failure to disclose favorable information to a defendant due to the prosecutor being under pressure with a large case load was not a violation of OPDA's *Brady* obligations. This testimony reflects OPDA's misunderstanding of OPDA's *Brady* obligations, as well as the inadequacy and unconstitutional nature of OPDA's *Brady* policy or custom.

114.    As early as 1998, which was before Jones' arrest and conviction, Orleans Parish Criminal Court Judge Calvin Johnson advised DA Connick that OPDA prosecutors were failing to comply with OPDA's *Brady* obligations.

115.    A 2012 study concluded that OPDA had failed to institute changes to its policies and customs sufficient to encourage consistent compliance with *Brady*.

116.    A 2017 study found that Orleans Parish had the highest per capita rate of cases involving misconduct, as well as the largest number of reversals, of any parish in Louisiana. The study described OPDA as a "hotbed for prosecutorial misconduct."

117.    These sources and studies evidence OPDA's unwritten policy or custom of not complying with its *Brady* obligations to the detriment of defendants' constitutional rights.

118.    Despite OPDA's history of recognized and condemned *Brady* violations, prior to and following *Kyles*, it, upon information and belief, did not revise its written policy or unwritten policy or custom.

### IX.    OPDA's Failure to Train, Supervision and/or Discipline

119.    OPDA has failed to adequately train, supervise, and/or discipline OPDA prosecutors with respect to their ongoing *Brady* violations.

120.    OPDA's failure to train and supervise OPDA prosecutors with respect to their Brady obligations is reflected in its written policy and unwritten policies and customs.

121.    OPDA failed to properly and adequately train and supervise its prosecutors with respect to their obligation to disclose information favorable to the defendant.

122.    Several former OPDA prosecutors have testified that they did not recall receiving any training on *Brady* at OPDA.

123.    OPDA failed to utilize checklists, audits, reviews, or coordinators to ensure that its prosecutors complied with *Brady* obligations.

124.    Former DA Connick testified that he personally "stopped reading law books" and "looking at opinions" when he led OPDA.

125.    OPDA also failed to discipline prosecutors who violated their *Brady* obligations, reinforcing its unwritten policy or custom, and incentivizing continued violation of defendants' constitutional rights.

126.    For example, DA Connick has testified that OPDA failed to discipline OPDA prosecutors who violated OPDA's *Brady* obligations because it would make his job more difficult.

127.    Keva Landrum-Johnson, the former head of OPDA, has testified that she did not recall any training for OPDA prosecutors on how to handle post-conviction claims that OPDA violated its *Brady* obligations.

128.    OPDA and the heads of OPDA were aware, or should have been aware, that OPDA prosecutors had repeatedly violated OPDA's *Brady* obligations and that there was a need to train and supervise prosecutors in order to prevent future similar violations.

129.    OPDA's failure to train or supervise its prosecutors amounted to deliberate indifference to defendants' constitutional rights.

130.    OPDA and its policymakers were on actual and/or constructive notice that OPDA's policies or customs failed to protect the rights of Jones and other criminal defendants, but were

deliberately indifferent to the known and/or obvious consequence that constitutional violations would result from these policies or customs.

## FIRST CAUSE OF ACTION – 42 U.S.C. § 1983
### (Defendant Jason Williams)

131.   Paragraphs 1-130 are repeated and realleged as if fully set forth herein.

132.   As stipulated by OPDA, acting under color of law, it withheld from Jones exculpatory and/or favorable evidence that was material to Jones' guilt or innocence in the three robbery incidents, in violation of Jones' right under the United States Constitution to the disclosure of such information.

133.   At all times relevant herein, OPDA maintained an unconstitutional written policy, officially adopted and promulgated by OPDA and heads of OPDA, with respect to OPDA's obligations to disclose exculpatory and/or favorable evidence to defendant.

134.   At all times relevant herein, OPDA maintained an unconstitutional unwritten policy, practice, custom, and/or usage with respect to OPDA's obligations to disclose exculpatory and/or favorable evidence to defendant.

135.   The existence of OPDA's policies or customs in which OPDA fails to adhere to its *Brady* obligations is well-documented.

136.   At all times relevant herein, OPDA failed to provide adequate training or supervision of OPDA prosecutors with respect to OPDA's obligation to disclose exculpatory and/or favorable evidence to defendant, despite OPDA's awareness of many prior instances in which it violated *Brady*, and even though it was obvious that such training and supervision was required to prevent further *Brady* violations. This failure to train and supervise was sufficiently common and well-settled that it constituted a custom that represented OPDA's official policy of not complying with its obligation to disclose information favorable to defendants.

137.    OPDA and the heads of OPDA, were on actual and/or constructive notice that the above-described official policies and customs failed to protect the right of Jones and other defendants like him under the United States Constitution, but were deliberately indifferent to the known and/or obvious consequence that constitutional violations would result from these official policies or customs.

138.    The policies or customs set forth were the moving force that caused the deprivation of Jones's right under the United States Constitution to the disclosure of evidence favorable to him that was material to his guilt or innocence.

139.    As a result of OPDA's violations of Jones' constitutional rights, Jones was wrongfully convicted for a crime he did not commit and imprisoned for nearly twenty-two (22) years.

140.    The conduct set forth was the cause-in-fact and proximate cause of Jones' injuries and damages, as described above.

141.    Defendant Williams, as the representative of OPDA, is liable to Jones pursuant to 42 U.S.C. § 1983.

### SECOND CAUSE OF ACTION- Louisiana Revised Statute § 22:1269
### (ABC Insurance Companies 1-10)

142.    Paragraphs 1-130 are repeated and realleged as if fully set forth herein.

143.    Defendants ABC Insurance Companies 1-10 may have issued and currently have in effect one or more policies of insurance covering Defendant Williams and/or OPDA with regard to the actions complained of herein, and obligating Defendants ABC Insurance Companies 1-10, jointly or severally, to pay on behalf of Defendant Williams and/or OPDA any sums the insureds may be obligated to pay Jones, or to indemnify Defendant Williams and/or OPDA for any sums the insureds may become obligated to pay Jones.

144.    As described above, Defendant Williams, as the representative of OPDA, is liable to Jones

for all damages sustained by Jones, including costs and attorney's fees. Defendants ABC Insurance

Companies 1-10 may be contractually obligated to pay all sums on behalf of Defendant Williams

and/or OPDA or to indemnify the insureds for these sums.

145.    Defendants ABC Insurance Companies 1-10 may be liable to Jones for any and all sums

described above up to their policy limits, notwithstanding the fact that Defendant Williams and/or

OPDA may themselves be able to assert claims of privilege or immunity from liability.

146.    Pursuant to Louisiana Revised Statute § 22:1269(B), Jones brings a direct action against

Defendants ABC Insurance Companies 1-10 to recover any and all sums they are obligated to pay

him on behalf of their insureds or for which they are obligated to indemnity their insureds.

### DEMAND FOR JURY TRIAL

147.    Mr. Jones demands a trial by jury on all causes of action set forth above.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Christopher Jones respectfully requests that this Court enter

judgment in his favor as follows:

a.  On the First Cause of Action, against Defendant Jason Williams, as the representative

of the Orleans Parish District Attorney's Office, compensatory damages in an amount

to be determined at trial pursuant to 42 U.S.C. §1983, costs, reasonable attorney's fees,

and legal interest from the date of judicial demand;

b.  On the Second Cause of Action, against Defendants ABC Insurance Companies 1-10,

an amount equal to any and all sums they are obligated to pay Mr. Jones on behalf of

Defendant Williams and/or the Orleans Parish District Attorney's Office or for which

they are obligated to indemnity the insureds;

   c. On all causes of action, granting Mr. Jones all other damages that may be shown at a

      trial of this matter and such other and further relief as this Court deems just and proper.


                   Respectfully submitted,

                   **SCOTT VICKNAIR, LLC**

                   **DAVID P. VICKNAIR, #34135**
                   **CAITLIN B. CARRIGAN, #33754**
                   **HOPE E. HUGHES, #35833**
                   909 Poydras Street, Suite 2025
                   New Orleans, LA 70112
                   (504) 500-1111 (Telephone)
                   (504) 226-2339 (Facsimile)
                   david@svlaw.law
                   caitlin@svlaw.law
                   hope@svlaw.law
                   *ATTORNEYS FOR PLAINTIFF, Christopher Jones*